IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VTECH CONSTRUCTION, INC., VTECH ENGINEERING, INC., GRAYSON, GRAYSON & ASSOCIATES, LLC, LORRI GRAYSON, and DAVID GRAYSON | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No.: 09-970-SLR |
| LISA McGONIGLE f/k/a LISA DENNIS, DORAZIO CONSTRUCTION, LLC, PATRICIA GERHART, CHRISTOPHER McGONIGLE, and QUANTUM CONTROLS, INC. | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

At Wilmington this _5ᵗʰ_ day of January, 2011, having reviewed plaintiffs' motion to enforce a putative settlement agreement, and the papers submitted in connection therewith;

IT IS ORDERED that said motion (D.I. 26) is denied, for the reasons that follow:

1. **Introduction**. On December 18, 2009, plaintiffs VTech Construction, Inc. ("VTC"), VTech Engineering, Inc. ("VTE"), Grayson, Grayson & Associates, LLC ("GGA"), and David Grayson filed this action ("federal action") against Lisa McGonigle (f/k/a Lisa Dennis, hereafter "Lisa McGonigle") and Dorazio Construction, LLC ("Dorazio"). (D.I. 1) By stipulation of the parties, an amended complaint was filed on April 12, 2010, joining Lorri Grayson as a plaintiff. (D.I. 11, ex. 1) Lisa McGonigle and

Patricia Gerhart ("Gerhart") initiated a related action ("the Chancery action") against plaintiffs and several other entities, in the Delaware Court of Chancery on April 17, 2010.[1] (D.I. 26 at ¶ 4) On September 29, 2010, a second amended complaint (D.I. 25) was filed by stipulation, joining Gerhart, Christopher McGonigle, and Quantum Controls, Inc. ("Quantum") as defendants. Plaintiffs, in their second amended complaint, seek legal and equitable relief arising from alleged violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 et seq., Delaware's Computer Misuse Act, 11 Del. C §§ 931 et. seq., and Delaware common law claims of conversion, breach of duty of loyalty, breach of fiduciary duties, and unjust enrichment. (D.I. 25) Presently before the court is plaintiffs' motion to enforce an alleged settlement agreement ("settlement agreement") resolving the federal and Chancery actions, and for award of attorney fees. (D.I. 26) Discovery has not yet commenced. This court has jurisdiction pursuant to 28 U.S.C. § § 1331, 1367 and 18 U.S.C. § 1030(g).

2. **Background.** VTC, VTE, and GGA are all Delaware chartered companies. (D.I. 25 at ¶¶ 2-4) VTC is or was engaged in the business of commercial construction. (Id. at ¶ 2; D.I. 33 at ¶ 2). GGA is engaged in the business of commercial construction. (D.I. 25 at ¶ 4) VTE is engaged in the business of providing professional engineering services for use in commercial construction. (Id. at ¶ 3) David Grayson is the "proprietor" of GGA and Lorri Grayson is a member of GGA. (Id. at ¶ 5) Lisa McGonigle is a former employee and vice president of, and minority shareholder in, VTC. (Id. at ¶ 6) Gerhart is a former employee and officer of, and shareholder in, VTC.

---

[1]10-5396-VCP

2

(*Id.* at ¶ 7; D.I. 33 at ¶ 7) Quantum is a Delaware corporation engaged in the business of commercial electrical construction. (D.I. 25 at ¶ 9) Christopher McGonigle is the husband of Lisa McGonigle. (*Id.* at ¶ 10; D.I. 33 at ¶ 10) Plaintiffs allege that Christopher McGonigle is Quantum's "manager." (D.I. 25 at ¶ 10)

3. The federal action arises from Lisa McGonigle's admitted accessing and copying of certain information. (D.I. 25 at ¶ 19; D.I. 33 at ¶ 19) Plaintiffs allege that Lisa McGonigle was not entitled to such access, that the information so obtained included, inter alia: (1) VTC's financial records; (2) valuable proprietary architectural drawings for projects belonging to plaintiffs; (3) the Graysons' personal financial records including tax returns; (4) payroll data containing identifying information of employees; and (5) customer and prospect lists. (D.I. 25 at ¶¶ 1, 19-21) Lisa McGonigle denies that she was not authorized to access and copy the information she obtained. (D.I. 33 at ¶¶ 19-20)

4. Plaintiffs further allege that Lisa McGonigle had already decided to leave VTC at the time she obtained the documents, concealed her access and copying from plaintiffs, and forwarded some of the documents, without authorization, to Christopher McGonigle by email. (D.I. 25 at ¶¶ 22, 26-27) In addition, plaintiffs allege that Christopher McGonigle then used the information, on his own behalf and that of Quantum, to unfairly compete with VTC. (*Id.* at ¶ 25)

5. Together, Lorri and David Grayson held a controlling interest in VTC, when they decided to wind down the company in late 2007 after approximately one year of operation. (D.I. 26, ex. 8) Plaintiffs allege that Lisa McGonigle had received VTC stock at no cost "in exchange for her continued loyal work," that instead she emailed several

3

VTC clients that she planned to leave VTC, quit VTC on December 14, 2007 without notice, and then opened a competing business, Dorazio, by mid-January of the following year. (Id.)

6. On July 28, 2010, Lisa McGonigle and Lorri Grayson (on her own behalf and on behalf of VTC and VTE) met, along with their respective counsel in the federal action, to discuss the possibility of a global settlement. (D.I. 26, ex. 1) It is undisputed that, at the meeting, "Lorri Grayson and Lisa McGonigle agreed to a valuation conducted by an independent CPA to determine the value of [Lisa McGonigle's and Gerhart's stock in VTC]." (D.I. 26, ex. 1) The terms discussed at the meeting included selection of the CPA, payment for the CPA's services, and the presentation of documents and arguments to the CPA for consideration. (D.I. 26 at ¶ 10)

7. Immediately following the meeting, Margaret M. DiBianca, Esquire ("DiBianca"), counsel for plaintiffs, prepared a general summary ("summary letter") of the agreement in principle that was reached between Lisa McGonigle and Lorri Grayson. (Id., ex. 3,4) DiBianca forwarded the summary letter, by email, to William X. Moore, Esquire ("Moore"), counsel for Lisa McGonigle. (Id.) DiBianca and Moore exchanged emails agreeing that the summary letter was complete as to the "general ideas" discussed in the meeting, although Moore stated, "I just want to make sure that there are no holes in [sic] stipulation that would allow any of the parties any wiggle room when a final valuation is derived." (Id., ex. 4-5) On July 30, 2010, Moore emailed DiBianca to inform her that "Patty is in agreement with the plan we arrived at the other day pending, of course, an agreement on the exact wording of the stipulation we eventually agree upon." (Id., ex. 6) DiBianca replied, later that same day, "[s]o is

4

Dave," and added that she would get a "substantive draft of the agreement" to Moore over the weekend. (*Id.*, ex. 7)

8. On August 2, 2010, DiBianca emailed Moore, regarding a "very rough draft" of the agreement, stating, "we can work on the case captions and similarly not-that-important details **once we've reached agreement on the meat of it**." (D.I. 30, ex. 5) (emphasis added) On August 3, 2010, Moore emailed DiBianca stating he had given DiBianca's draft a "quick look" and indicated he would discuss the draft with Lisa McGonigle. (*Id.*, ex. 8) DiBianca replied the same day noting that there were two issues she thought of "after the fact:" (1) a thumb drive containing documents to be returned to the Graysons if possible, and (2) having Lisa McGonigle and Gerhart "agree not to purse [sic] any other litigation or administrative actions or encourage anyone to do so (i.e. the Delaware Association of Professional Engineers, which Lisa said she had no part in, . . . )." (*Id.*)

9. Up to this point, discussions regarding valuation of VTC centered around parameters of the data to be included, but not a specific choice of valuation method. By August 4, Moore finally had a chance to review the original draft, and emailed DiBianca regarding the valuation stating, "[i]t was my understanding that we were always talking about fair market value not net book value." (*Id.*) DiBianca responded, "[i]t was definitely my understanding that we were talking about net book value . . . ." (*Id.*) As late as August 23, DiBianca emailed Moore with regard to a list of projects proposed to be included in the valuation ("List #2"), stating, "[t]his one is not up for

5

negotiation . . . ." (*Id.*)  Negotiations eventually degraded to the point that Moore was "no longer authorized to discuss anything relating to the Chancery case." (*Id.*, ex. 11)

10. **Standard of Review.**  A district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it.  *See Hobbs & Co. v. Am. Investors Mgmt,, Inc.*, 576 F.2d 29, 33 & n. 7 (3d Cir. 1978).  Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of review.  *See Tiernan v. Devoe*, 923 F.2d 1024, 1031-32 (3d Cir. 1991).  Accordingly, the court must treat all the non-movant's assertions as true, and "when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Id.* at 1032 (internal quotation and citation omitted).  Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Courts should not summarily enforce purported settlement agreements, in the absence of an evidentiary hearing, where material facts concerning the existence or terms of an agreement to settle are in dispute. *See id.* at 1031 (*quoting Garabedian v. Allstates Eng'g Co.*, 811 F.2d 802, 803 (3d Cir.1987)).

11. **Discussion.**  The court must determine whether the July 28 meeting and subsequent agreement of Gerhart and David Grayson, as relayed by Moore and DiBianca, created an enforceable agreement to settle the federal and Chancery actions.  It is undisputed, in the present matter, that Delaware law governs the formation of any such agreement.  "Under Delaware law, a contract 'comes into existence if a reasonable person would conclude, based on the objective

6

manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms.'" *Intellisource Grp., Inc. v. Williams,* No. C.A. 98-57-SLR, 1999 WL 615114, at *4 (D. Del. Aug. 11, 1999) (*quoting Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*, Civ. A. No. 12888, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993)). "Where there is no mutual assent or meeting of the minds, there is no enforceable contract in Delaware." *Thomas v. Thomas*, No. 2008-10-102, 2010 WL 1452872, at *4 (Del. Com. Pl. Mar. 19, 2010) (*citing Rodgers v. Erickson Air-Crane Co. L.L.C.*, No. 98C-07-014-WTQ, 2000 WL 1211157, at *6 (Del. Super. Aug. 17, 2000)).

a. **Essential terms.** Specifically at issue in the case at bar is whether, viewed objectively, the method of valuation[2] is an essential term of the agreement. Absent a definitive agreement to leave the selection of a valuation method to the discretion of the CPA, the method of valuation would reasonably be considered an essential term of the agreement. DiBianca's and Moore's email exchange of August 4 demonstrates that each side had assumed the CPA would be restricted to a particular, but different, method of valuation. As the parties failed to delegate selection of a valuation method to the CPA, the court finds that the method of valuation is an essential term of the settlement agreement.

b. **Contract formation.** Gerhart's acceptance, as described by Moore on July 30, was contingent on "the exact wording of the stipulation [the parties] eventually agree[d] upon." The email exchange of August 4 also makes clear that there was no

---

[2]I.e. net book value, fair market value, or other methods discussed by the parties.

"meeting of the minds" as to the method of valuation.  The remainder of the email

exchanges support the court's conclusion that negotiations were ongoing and essential

terms never agreed upon.  The court finds, therefore, that no enforceable settlement

agreement was formed between the parties.

12. **Attorney Fees.**  Plaintiffs' request for award of attorney fees is denied as

moot.[3]

13. **Conclusion**.  For the above reasons, the court denies plaintiffs' motion for

enforcement of the putative settlement agreement.


United States District Judge

---

[3]Defendants also seek award of attorney fees.  (D.I. 30 at ¶¶ 32-34)  The court
declines to do so.

8